*584 OPINION OF THE COURT
Meyer, J.
A mortgagor, who has given an estoppel certificate stating that there are no defenses or offsets to the mortgage or to the bond which the mortgage secures, will be estopped from asserting the defense of criminal usury unless it be shown that (1) the mortgagor executed the estoppel certificate under duress or other basis for invalidation, or (2) the assignee took with knowledge of the criminally usurious nature of the transaction or of the fact that duress (or other invalidating circumstances) was exerted in obtaining execution of the estoppel certificate. The papers on the motion and cross motion in the foreclosure action which is the subject of this appeal having raised issues of fact concerning whether the transaction was criminally usurious, concerning what, if anything, the assignees were aware of with respect to the nature of the transaction and concerning duress, it was error for the Appellate Division, in reversing Special Term’s denial of the defendant mortgagor’s motion to amend to allege criminal usury and grant of the assignees’ cross motion for summary judgment, to grant to defendant summary judgment declaring the mortgage void as a matter of law and dismissing the complaint. The order of the Appellate Division should, therefore, be modified to delete so much thereof as grants judgment to defendant declaring the mortgage void and dismissing the complaint, and to remit the matter to Supreme Court, Suffolk County, for further proceedings, and, as so modified, should be affirmed, with costs.
I
In 1974, the Foursome Inn Corp., owner of the Surf and Sand Inn, in Montauk, New York, borrowed $35,000 from Broadhollow Funding Corporation secured by a mortgage on the inn premises. The mortgage was for a three-year term at an interest rate of 24% per annum and contained a provision that the mortgage principal and interest “shall become due at the option of the mortgagee *** after default * * * in furnishing a statement of the amount due on the mortgage and whether any offsets or defenses exist against the mortgage debt.” Only $32,900 was paid at *585 closing to Foursome or for closing costs, however, the remaining $2,100 having been paid to Ira S. Schwartz, then secretary-treasurer of Broadhollow.
At Schwartz’ examination before trial, conducted at Foursome’s instance and a copy of which was annexed to Foursome’s moving papers on the first motion hereafter referred to, he testified that he was a licensed real estate broker, that the mortgage lender was in fact Stallone Enterprises Corporation (SECO) though the mortgage was taken in Broadhollow’s name because of marital problems of SECO’s owner, that the $2,100 represented a 6% commission to Schwartz pursuant to a commission agreement with Foursome, and that Broadhollow serviced the mortgage for SECO before its assignment to plaintiffs and continued to do so for plaintiffs after that assignment.
The assignment to plaintiffs was made in October, 1975, 10 days after Beatrice Reilly, the president of Foursome, executed on its behalf an estoppel certificate stating that “there are no defenses or offsets to said mortgage, nor to the bond which it secures.” Negotiations with Mrs. Reilly for the certificate were engaged in by both Ira Schwartz and his father, Abraham, then president of Broadhollow. Mrs. Reilly’s affidavit, submitted in support of the third motion by defendant hereafter referred to, sets forth facts concerning both threats to foreclose and cajoling by the Schwartzes which suggest that she may have been misled concerning the nature of her default, the offer of a proposed extension of the mortgage, or both.
In July, 1976, Foursome defaulted on its payments. Plaintiffs then declared the entire principal balance due and instituted, this foreclosure action. Foursome’s answer was no more than a general denial but, subsequently, it moved for leave to amend the answer to assert the affirmative defense of criminal usury. As already noted, its moving papers on that motion included a copy of Ira Schwartz’ deposition. Plaintiffs, relying on the estoppel certificate, cross-moved for summary judgment. Special Term denied the motion to amend and granted plaintiffs’ cross motion for summary judgment, holding the defense not available to Foursome because waived by its execution of the estop *586 pel certificate delivered to plaintiffs. On motion for reargument Special Term adhered to that ruling. A referee to compute was then appointed and after receipt of his report judgment of foreclosure and sale was entered. On the eve of sale, however, defendant having obtained additional counsel moved to vacate the judgment on papers, including the affidavit of Mrs. Reilly above referred to, which reiterated the criminal usury involved and set forth facts suggesting, as above noted, that she signed the estoppel certificate as. a result of threats or of being misled, or both. That motion, too, was denied.
On appeal to the Appellate Division that court reversed, on the law, the orders denying the motions to amend the answer and to vacate the judgment, granted both motions, denied plaintiffs’ motion for summary judgment and, acting pursuant to CPLR 3212 (subd [b]), granted Foursome summary judgment declaring the mortgage void and dismissing the complaint. It reasoned that the societal interests protected by the public policy declared in the criminal usury statute could not be affected by estoppel based on conduct of the parties to the mortgage and, therefore, did not reach the question of duress. We conclude that (1) an estoppel certificate may waive criminal as well as civil usury; (2) duress, other invalidating circumstances, or knowledge on the part of the assignee before he takes the assignment of the criminal nature of the transaction or of the exertion of duress may, however, invalidate or negate the estoppel certificate; and (3) there are in the instant case issues of fact which cannot be resolved on motion for summary judgment. We, therefore, modify as above indicated.
II
Though he be a bona fide holder, an assignee of a nonnegotiable bond and mortgage takes subject to any defense that would have prevailed against his assignor (Beck v Sheldon, 259 NY 208, 211; Kommel v Herb-Gner Constr. Co., 256 NY 333, 336). The rule is different, however, when the mortgagor gives the assignee an estoppel certificate (Riggs v Purssell, 89 NY 608, 610; see Real *587 Property Law, §254, subds 2, 7)[1] or with notice of his rights and of the facts “does what amounts to a recognition or adoption” of the transaction “although it was originally void or voidable” (Rothschild v Title Guar. & Trust Co., 204 NY 458, 464; Ann., 110 ALR 451, 452, 457). The assignee’s right of recovery does not depend upon the title or interest of his assignor, but upon the mortgagor’s representation by his certificate or by his conduct that the mortgage is valid and existing (Miller v Zeimer, 111 NY 441, 444; Weyh v Boylan, 85 NY 394, 397; Payne v Burnham, 62 NY 69, 72; see Union Dime Sav. Inst. of City of N. Y. v Wilmot, 94 NY 221; Ann., 165 ALR 626, 717).
The basis for the latter rule is, of course, the doctrine of estoppel in pais (Payne v Burnham, supra, at p 73; Ferguson v Hamilton, 35 Barb 427, 437). It turns not upon any view of the negotiability of the certificate (Weyh v Boylan, supra, at p 399) or the validity of the mortgage (Valentine v hunt, 115 NY 496, 504), but upon the fact that the mortgagor would, if allowed to urge the defense, “obtain an unconscientious advantage at the expense of an innocent person” (Weyh v Boylan, supra, at p 398; see, also, Rothschild v Title Guar. & Trust Co., 204 NY 458, 464, supra; Restatement, Contracts 2d, §90, Comment a), and the long-established principle that “where one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss, must sustain it” (National Safe Deposit Co. v Hibbs, 229 US 391, 394, quoted with approval in Bunge Corp. v Manufacturers Hanover Trust Co., 31 NY2d 223, 228). Estoppel does not render the mortgage valid but prevents “one who has represented it to be valid from asserting that it is void, to the injury of those who have acted in reliance upon the representation” (Claflin v Boorum, 122 NY 385, 389; Valentine v hunt, supra). The policy of the usury statute is not, *588 however, ignored, for the innocent assignee is permitted to recover only the amount advanced with interest, rather than to enforce the mortgage for its face amount (Miller v Zeimer, supra, at p 446; Payne v Burnham, supra, at p 74; Bennis v Thomas, 14 AD2d 895; Klein v Meisels, 254 App Div 603; see Osborne, Mortgages, § 111, p 273; Ann., 165 ALR 626, 717).
The conduct or certificate must, however, have influenced the assignee to accept the mortgage to his injury (Payne v Burnham, supra, at p 73). That means not just reliance upon the existence of the certificate, but on the facts expressed by or implicit in it (Wilcox v Howell, supra, at p 403; see Claflin v Boorum, supra; Weyh v Boylan, supra; Hyde Park Terrace Co. v Jackson Bros. Realty Co., 161 App Div 699; Ann., 110 ALR 451, 462). An assignee who takes with knowledge can no more enforce the mortgage, whether as to principal or interest, than could the usurer. Knowledge by the assignee of the usurious nature of the transaction will, therefore, defeat an estoppel claim (Riggs v Purssell, supra; Gleason v O’Neill, 234 App Div 264; Merwin v Romanelli, 141 App Div 711).
The rules thus developed concern, it is true, so-called civil usury, as the Appellate Division noted, but were developed in relation to a statute (3 Revised Statutes [5th ed], part 2, ch 4, tit 3, § 5, now part of General Obligations Law, § 5-511, subd 1), which provided that a transaction in which interest in excess of the prescribed rate was taken “shall be void.” Moreover, they became the established rules not without some hesitation and the realization that they trenched upon the policy of the usury law (Miller v Zeimer, supra, at p 445; Payne v Burnham, supra, at p 72; Ferguson v Hamilton, supra, at p 439).
Ascertainment of the legislative intent behind enactment of section 190.40 of the Penal Law and subdivision 3 of section 5-521 of the General Obligations Law upon the policy behind which the Appellate Division relied, requires consideration of the decisional law background above set forth, of which it may be presumed the Legislature was aware and, to the extent it left it unchanged, that it accepted (Transit Comm, v Long Is. R. R. Co., 253 NY 345, *589 354-355; Orinoco Realty Co. v Handler, 233 NY 24, 30; People v Colozzo, 54 Misc 2d 687, affd on opn below 32 AD2d 927). Also to be considered are the facts that for 115 years, from the passage of chapter 172 of the Laws of 1850 until 1965, corporations were prohibited from interposing “the defense of usury in any action” (see Rosa v Butterfield, 33 NY 665) and that until 1965 there existed, for practical purposes, no criminal sanction whatsoever for usury, whatever the effective rate of interest charged (Seventh Ann Rep of Temporary Commission of Investigation, Legis Doc, 1965, No. 100, p 72; Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law, § 190.40; Note, 66 Col L Rev 167, 170). The April, 1965 Report of the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket (particularly pp 22, 29, 82-84) brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the “roughing up tactics” used by usurious lenders to enforce payment (id., at p 84). That report was studied by the Attorney-General, the Superintendent of Banks and the Governor’s counsel, who, working with the State Commission of Investigation (see the Governor’s Message of Approval, NY Legis Ann, 1965, pp 509-510), prepared an administration memorandum (NY Legis Ann, 1965, pp 46-50) which was sent to the Legislature with the bill which ultimately became chapter 328 of the Laws of 1965. With respect to the provision which became subdivision 3 of section 5-521 of the General Obligations Law, that memorandum stated: “The bill would also provide that corporations may interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum. This measure is vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury. As noted above, loan-sharks with full knowledge of the present law, make it a policy to loan to corporations. The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious *590 loan. This is a purely artificial device used by the loan-shark to evade the law — an evasion which this proposal would prevent. Furthermore, it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted.” (Italics supplied.)
Noteworthy is the fact that though the Legislature authorized the pleading of criminal usury as a defense by a corporation (General Obligations Law, § 5-521, subd 3), it made no change in the provisions of section 5-511 declaring “void,” as to individuals and other entities as well as corporations, any instrument reserving interest in excess of the legal rate although it must be deemed to have been aware of prior decisional law holding such an instrument enforceable, as above set forth, when an estoppel certificate has been given. It could, of course, in light of that case law, have abolished estoppel in pais as related to an estoppel certificate given to a criminal usurer by a mortgagor, or limited the effect of such a certificate as it had done in the second unnumbered paragraph of subdivision 2 of section 5-521 of the General Obligations Law. It made no mention of estoppel certificates and limited its statement of the civil purpose of the amendments made to proscription of recovery by “a usurer *** on a loan for which he could be prosecuted.” Its failure to close off the estoppel certificate avenue as a means for a usurer to realize on his illegal loan may have been an oversight, though in view of the case law history above detailed that hardly seems likely. Equally probable is it that the Legislature, recognizing the “two innocent persons” rule, was unwilling to penalize by the loss of both principal and interest an assignee who in good faith-reliance on the mortgagor’s assurance of the absence of any defense had purchased the obligation, because the Legislature believed limitation of the assignee’s recovery to what he paid plus legal interest to be a sufficient deterrent to make purchasers of mortgages wary of professional usurers and a sufficient protection to the mortgagor who by certifying the absence of a defense has made transfer of the mortgage by the usurer possible.
So to suggest is not, as the concurrence and the Appellate Division indicate, abhorrent to public policy in any way. To the contrary, it is abhorrent to the policy of the law *591 in the name of public interest to make an innocent assignee pay for the crime of the usurer in order to protect the borrower who, by his conduct or estoppel certificate, has misled the assignee. It is, moreover, wholly unnecessary to do so. People v Young (207 NY 522) makes clear that the victim of criminal usury cannot by accepting restitution affect in any way the People’s power to prosecute and that rule applies as well to estoppel by conduct or by certificate. The criminal usurer continues, therefore, to be subject to prosecution for a class E felony, the maximum prison term for which is four years. He remains subject also to civil liability for his criminal act; to the assignee who has been defrauded through the usurer’s obtention of a false estoppel certificate for the difference between the face amount of the bond transferred and what he has been able to collect on it from the debtor; to the debtor from whom the usurer could have collected neither principal nor interest for the principal and interest which the debtor has been required to pay to the innocent assignee, the debtor not being in pari delicto with the usurer.[2] Neither public welfare nor the public policy declared by chapter 328 of the Laws of 1965 is denigrated one whit by the limited recovery permitted to an innocent assignee; to the contrary, the public interests are vindicated fully, both civilly and criminally. Indeed, to relegate the assignee to an action against the usurer, as the concurrence suggests, is to denigrate the two innocent persons policy by turning that long-respected rule completely on its head.
Nor by so holding do we infer from legislative silence alone the adoption of decisional law (cf. Boys Market v Clerks Union, 398 US 235, 241), for there is here clear and vigorous legislative action addressing the criminal usury *592 problem in all aspects but this one. It is, rather, a recognition of the principle that “the intention to change a long-established rule or principle is not to be imputed to the legislature in the absence of a clear manifestation” (Matter of Delmar Box Co. [Aetna Ins. Co.], 309 NY 60, 66; accord Shapira v United Med. Serv., 15 NY2d 200, 218; see McKinney’s Cons Laws of NY, Book 1, Statutes, § 153), especially when the change affects title to property or rules of liability (Seligman v Friedlander, 199 NY 373, 376). Public policy determined by the Legislature is not to be extended by a court by reason of its notion of what the public policy ought to be (Waddey v Waddey, 290 NY 251, 256; see Straus & Co. v Canadian Pacific Ry. Co., 254 NY 407, 413-414). Moreover, though estoppel in pais is a doctrine of judicial rather than legislative origin and thus subject to change by us, we do not believe that we would be justified in making a change predicated upon the criminal usury provisions of chapter 328 of the Laws of 1965, when the Legislature itself did not see fit to do so and the result would be unfair to an assignee who has acted in good faith reliance on an estoppel certificate (cf. Codling v Paglia, 32 NY2d 330, 344-345). The Legislature may, of course, still change the decisional rule should it deem that desirable or wise.
Accordingly, we reject the Appellate Division’s basic premise and hold that, until the Legislature otherwise provides,[3] a valid estoppel certificate executed by a mortgagor and relied upon in good faith by the assignee of the mortgage will preclude the assertion of usury, whether civil or criminal, as a complete defense.
Ill
We are thus brought to consideration of the issue of duress which the Appellate Division found it unnecessary to decide. What we consider, of course, is duress as it affects execution of the estoppel certificate, and the first thing to *593 be noted is that duress in obtaining the certificate is irrelevant unless the mortgage itself is found to be usurious and, therefore, void and unenforceable but for the estoppel. This means that the provisions of the mortgage permitting the mortgagee to accelerate principal and interest for failure to give an estoppel certificate, though sanctioned by subdivisions 2 and 7 of section 254 of the Real Property Law, will not obviate the claim that the certificate was obtained by duress.[4]
In Wilcox v Howell (44 NY 398, 402, supra) we held that estoppel does not operate to preclude an obligor from asserting that the instrument claimed to estop him was obtained by fraud (accord Laurel Realty Co. v Galasso, .6 AD2d 889; see Weyh v Boylan, supra, at p 401), and the applicability of that rule to duress has been recognized in Oleet v Pennsylvania Exch. Bank (285 App Div 411; see, also, Uniform Commercial Code, § 3-305, subd [2], par [b]). Those holdings having been part of the decisional law complex in light of which chapter 328 of the Laws of 1965 was enacted, and the strong-arm tactics of loan-shark enforcers having played such a prominent part in the Report of the State Investigation Commission, the conclusion must be that the Legislature intended no change of prior law in this respect.
Duress in obtaining the estoppel certificate will, therefore, invalidate it. We are not unaware of the effect of that holding upon the marketability of mortgage assignments, but conclude that estoppel being essentially a doctrine arising from inequitable action or conduct, the rule should not, absent legislative change, be applied when the mortgagor’s action or conduct has been coerced (cf. Mandelino v Fribourg, 23 NY2d 145, 148). Whether an estoppel certificate has been obtained by duress will generally be a question of fact, turning not just upon whether there was a threat to foreclose, but upon whether the trier of fact concludes from the circumstances surrounding the bargaining between the parties to the giving of the certificate or to the conduct relied upon and relative to the bargaining *594 positions of both that the mortgagor acted under the influence of fear and would not have done so otherwise (see Restatement, Contracts 2d, §§ 174-175; 13 Williston, Contracts [3d ed], § 1604; 2 NY PJI 900-901).
IV
The Appellate Division, applying the formula set forth in Band Realty Co. v North Brewster (37 NY2d 460), concluded that the true interest rate was 27.7% per annum[5] and, therefore, clearly in excess of the maximum prescribed by section 190.40 of the Penal Law. However, in concluding as a matter of law that the mortgage was criminally usurious, it overlooked the facts, outlined above, testified to by Ira Schwartz, that raised a triable issue of fact concerning whether the $2,100 was in fact a legitimate commission. True, the finder’s fee is a device often resorted to by unscrupulous lenders (1965 Report of State Investigation Commission, Investigation of Loan-Shark Racket, pp 73-75). But a commission payable to Schwartz as agent for Foursome (with whom he testified he had an agreement) would not necessarily make the transaction usurious (Salvin v Myles Realty Co., 227 NY 51; Guardian Mut. Life Ins. Co. of N. Y. v Kashaw, 66 NY 544; cf. General Obligations Law, § 5-531; see Ann,, 52 ALR2d 703; 32 NY Jur, Interest & Usury, §§67-69). Usury must be proved by clear evidence as to all its elements and will not be presumed (Giventer v Arnow, 37 NY2d 305; Brown v Robinson, 224 NY 301; Grannis v Stevens, 216 NY 583). Whether the commission was a cover for usury was, therefore, a question of fact (London Realty Co. v Riordan, 207 NY 264, 266) which the Appellate Division could neither assume nor decide.[6] An additional reason why summary judgment should not have been granted to defendant is that, defendant’s motion to amend its answer to assert criminal usury having been denied by Special Term, plain *595 tiffs had neither reason nor opportunity to submit proof on the question whether the $2,100 paid to Ira Schwartz was a true commission. Fortuitously defendant’s papers on the motion to amend supplied the omission by annexing Schwartz’ deposition, but had that not been so it would, nevertheless, have been improper to grant summary judgment to defendant under CPLR 3212 (subd [b]) in view of the state of the pleadings as the matter reached the Appellate Division. The papers before that court were also sufficient to require plaintiffs to come forward with more than the bare statement that an estoppel certificate had been given, to show that they acted in reliance upon the facts it stated and without knowledge of the commission deduction which defendants allege made the transaction usurious, and to respond to defendants’ claim of duress.
For the foregoing reasons, the order of the Appellate Division should be modified and affirmed, with costs, as above indicated.
Chief Judge Cooke (concurring). A lender who may be criminally prosecuted for a particular loan should not be permitted to avoid the civil consequence of this wrong through the simple expedient of obtaining a waiver from the borrower. As a matter of public policy, I would hold that criminal usury is not waivable outside a judicial proceeding.
Two aspects of criminal usury are abhorrent to public policy. First, the excessive interest charged is considered repulsive to our values. It is nothing more than a thoroughly unscrupulous exploitation of another’s vulnerability. Society will not condone one person’s taking unfair advantage of another’s weaker position (see, e.g., Barnard v Gantz, 140 NY 249 [undue influence]; Restatement, Contracts 2d, § 177). Second, the exaction of criminally excessive interest is, in the public’s mind, inextricably linked with violent methods of collecting delinquent debts.
In response to these problems, the Legislature in 1965 made criminal those loans that bear interest exceeding 25% per annum (L 1965, ch 328, § 1; see Penal Law, § 190.40).[1] At the same time, the Legislature also empow *596 ered corporations to assert criminal usury as an affirmative defense (L 1965, ch 328, § 6; see General Obligations Law, § 5-521), in part to eliminate the lenders’ practice of requiring individual borrowers to incorporate so that the defense of usury could not be raised at all (NY Legis Ann, 1965, p 50).
The majority notes the long-standing rule that civil usury can be waived as a defense. The majority then concludes that the Legislature intentionally adopted this rule in reference to criminal usury out of solicitude for the innocent assignee, although the majority admits that the omission may have been mere oversight (at p 590). So reasoning, the majority refrains from “extending” public policy as determined by the Legislature (id., at pp 590-591). Today’s decision is not only not reflective of public policy but, on the contrary, destroys it. If the lender can compel the individual to incorporate, there is no reason why that same individual cannot be compelled to sign a waiver of defenses. And this “compulsion” need not amount - to legal duress — the same circumstances which drove the borrower to the usurious lender in the first place will also serve to motivate the execution of the waiver. With the waiver in hand, the lender may now freely negotiate the illegal contract to third parties.
The problems inherent in permitting waiver of criminal usury may be best observed by use of a hypothetical. Needing $5,000 and unable to obtain a loan from a legitimate lender, A borrows the money from B, who requires that A sign a note for $10,000 and a certificate disavowing any defenses. The note is for one year and bears interest at 22%. On its face, the note evidences a noncriminal loan. Of course, in reality the loan is criminally usurious, requiring payment of $7,200 interest on a $5,000 loan, a rate of 144% *597 (see Band Realty Co. v North Brewster, 37 NY2d 460). B does not wish to carry the loan and therefore discounts it to C for $8,500. C is unaware of the true transaction and so takes the note as a holder in due course. Given today’s result, A is barred from asserting any defense and the court is required to enforce an illegal contract proscribed by penal sanction. This is untenable.
Prohibiting the waiver of criminal usury does not leave the assignee without any recourse. The assignor warrants the validity of the instrument, including that there is no defense good against him (see Uniform Commercial Code, § 3-417, subd [2], par [d]; Restatement, Contracts 2d, § 333, subd [1], par [b]). Thus, the assignee may recover from the lender, the party who should properly bear the burden for violating the law. No great procedural difficulties are presented, either. Once the borrower raises the affirmative defense, the assignee may amend the complaint to include a claim against the assignor. In this way, all parties to the instrument will be before the court and all will be bound by the determination of the nature of the transaction. In short, the assignee will recover — either from the borrower or the assignor.[2]
The majority equates civil usury and criminal usury in reaching its conclusion. There is, however, a critical distinction that may be succinctly stated. Civil usury, although illegal, violates private law only. Criminal usury, however, has been deemed an injury to the public welfare as well as to private rights. The usurer who can be jailed *598 should not be allowed to profit from the wrong by simply obtaining a waiver.
It is difficult also to accept the majority’s discussion of duress. It first suggests that duress is available only if the underlying mortgage is illegal (at pp 592-593). Duress, however, is a real defense which always follows the document (see Uniform Commercial Code, § 3-305, subd [2], par [b]; Restatement, Contracts 2d, §336, subd [1]). Consequently, the legality of the underlying transaction should have no bearing on the validity of the waiver if the latter were obtained through duress.
More noteworthy, because inconsistent with the rule announced, is the implication that the certificate will be invalid if it was obtained by threatening to enforce the legal rights set forth in the mortgage (at p 593, n 4). The majority would hold that these threats constitute duress if the mortgage is usurious so that no legal rights are provided. In so arguing, the majority has gone full circle: the borrower is estopped from asserting against an assignee the defense of criminal usury unless the waiver was obtained by threatening to enforce the usurious contract, in which case the waiver is invalid and the defense may be asserted against the assignee so as to void the contract. Thus, the borrower is allowed to do indirectly what the majority declares he or she cannot do directly — defeat the waiver and avoid the contract by raising the defense of criminal usury.
I concur, however, with the majority’s conclusion that summary judgment was improperly granted. There exists a question of fact as to the legitimacy of the commission paid to Ira Schwartz. If the commission was proper, then the loan was not usurious. For that reason, the Appellate Division’s order should be modified and the case remitted for trial. It cannot be overemphasized, however, that public policy as expressed by the Legislature demands that all waivers of criminal usury be declared ineffective per se.
Judges Jones, Wachtler and Fuchsberg concur with Judge Meyer; Chief Judge Cooke concurs in result in a separate opinion in which Judges Jasen and Gabrielli concur.
*599 Order modified, with costs to appellants, and case remitted to Supreme Court, Suffolk County, for further proceedings in accordance with the opinion herein, and, as so modified, affirmed.

. Clark v Sisson (22 NY 312, 316) held the words “value received” in a bill of exchange not to estop defenses of usury, fraud or duress and Wilcox v Howell (44 NY 398, 402) states in dictum that certification of validity in the mortgage itself will not bar a defense of fraud. (See, also, Ferguson v Hamilton, 35 Barb 427, 439.) Weyh v Boylan (85 NY 394, 401), however, distinguished both and held a certificate executed at the same time as the mortgage, though separate from it, sufficient to bar a defense of usury. It is not clear, therefore, whether certification in the mortgage or bond will bar a defense of usury, but the certificate in the present case having been executed long after the mortgage, we need not resolve the question.

. The suggestion in footnote 2 of the concurrence that such recovery may not be had from the usurer overlooks the change wrought by chapter 328 of the Laws of 1965. It constitutes no stretch of statutory intent or of the language of sections 5-511, 5-513 and 5-519 of the General Obligations Law to recognize a disqualification of the criminal usurer to recover any part of the money loaned, and a corresponding right of the borrower to get back whatever he has paid, even though prior law would not have required that result as to a civil usurer (see Schwartz v Userowitz, 56 Misc 2d 1016, affd 31 AD2d 1010). The cases relied upon in the concurrence do not speak to the legislative intent behind outlawing interest in excess of 25% and in any event so far as relied on are either dictum or are distinguishable on their facts. Not to recognize such an action is, in the name of deterring criminal usury, to protect the criminal usurer against civil liability, an obviously inconsistent and inequitable result.

. Respondent suggests that subdivision 3 of section 13-101 of the General Obligations Law is such a provision, but it speaks to a transfer forbidden by statute or which would contravene public policy. Here the Legislature has forbidden usury but has failed to forbid or declare contrary to public policy the transfer of a criminally usurious mortgage and that failure, for the reasons set forth in the text, cannot be deemed simply an oversight.

. Were the mortgage not void they would nullify any claim of duress because it is not duress to threaten to take action which is legally permissible (Muller Constr. Co. v New York Tel. Co., 40 NY2d 955; Avey v Town of Brant, 263 NY 320).

. The term of the mortgage being three years, one third of the $2,100 discount or $700 is added to the interest payable annually on the note (24% times $35,000 equals $8,400). The total interest of $9,100 compared to the principal actually received ($35,000 minus $2,100 or $32,900) establishes the true interest rate as 27.7%.

. Plaintiffs note that Schwartz has never produced the writings referred to in his testimony, but that furnishes no ground for disregarding his oral testimony, though, if not remedied at trial, it will furnish a basis for an adverse inference as to his credibility (Mullen v Quinlan & Co., 95 NY 109; see 1 NY PJI2d 78-81).

. It should be noted that in criminalizing these usurious practices, the Legislature *596 was not only concerned with the stereotypical loan shark accompanied by a strong-arm enforcer. The Legislature specifically recognized that the criminal usurer often “conducts his business wholly within the law” (as it then existed), taking advantage of legal loopholes, and relying on reputation rather than actual intimidation to collect loans (NY Legis Ann, 1965, p 48). Thus, it can only be concluded that the Legislature intended to penalize those usurious lenders who operate “under high-sounding business names, with offices and other trappings of legitimacy” (id.).

. The majority’s suggestion that the borrower may sue the usurer is unpersuasive. Although the Legislature has recognized that a borrower may sue a usurious lender (see General Obligations Law, §§ 5-513, 5-515), I do not believe that it intended this to be the sole source of relief. Nor can the public policy against criminal usury be advanced by imposing this burden upon the borrower. This is particularly true when the lender is one who employs intimidation and physical assault to enforce loans. The proper goal is to deter the activity altogether, not merely to afford relief to those borrowers bold enough to sue the lender.
In any event, even if the majority’s version of public policy were acceptable, I find no authority for the proposition that the usurer would be civilly liable to the borrower for the principal as well as the interest paid (at p 591). To the contrary, the law until now has been that the borrower’s recovery is limited only to the excess interest paid (General Obligations Law, § 5-513; see, also, Pisano v Rand, 30 AD2d 173,178 [citing Patterson v Birdsall, 64 NY 294; 32 NY Jur, Interest and Usury, § 84; Ann., 59 ALR2d 522, 527,534, 544-545] [citing Palen v Johnson, 50 NY 49]). Whether the cause of action envisioned by the majority should be recognized is not properly before this court. The majority is, in iffect, creating an action in 1981 to justify its view of the Legislature’s intent in 1965.